**IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

CARL VICKERY,                      )
                                        )
            Plaintiff,           )
                                          )
v.                              )        CIVIL ACTION NO.
                                        )        12-00731-CB-C
MEDTRONIC, INC.               )
                                        )
            Defendant.       )

## OPINION and ORDER

This action, filed pursuant to 42 U.S.C. § 1981, involves several employment discrimination claims based on "reverse" discrimination and retaliation. The defendant has filed a motion seeking summary judgment on all claims. (Doc. 45.) After due consideration of the motion, plaintiff's response, and all supporting evidence and briefs, the Court finds that the motion is due to be granted.

## FACTS

**Background**

Plaintiff Carl Vickery was employed by defendant Medtronic, Inc. from 2006 until 2012. Vickery has an associate's degree in nursing, as well as an undergraduate degree in social work, and a master's degree in counseling. For two years immediately prior to being hired by Medtronic, Vickery was employed as a surgical nurse. Initially, Vickery, who is white, worked in Medtronic's Navigation division as a Computer Assisted Surgical Specialist where he provided technical support to surgeons using Medtronic navigation equipment to perform spine or cranial surgeries. In 2007, Vickery transferred to the Neuromodulation division where he

worked initially as a Procedures Solutions Specialist for the Deep Brain Stimulation (DBS) therapy.  In April 2008, Vickery became Activa Development Manager (ADM) in DBS, a position he held until his termination

Neuromodulation and Navigation are separate divisions of Medtronic,[1] with different devices aimed at different types of medical procedures.  Navigation provides equipment for spinal and cranial surgeries. Neuromodulation provides devices for deep brain stimulation (DBS) therapy.  DBS uses medical devices implanted deep within the brain to treat certain conditions, such as Parkinson's disease.[2] In the Navigation unit, Vickery provided technical support to surgeons using Medtroinc equipment to perform spine or cranial surgeries.  This technical support included operating a computer, infrared camera system, and medical devices or equipment attached to drills and probes.   In the Neuromodulation division, Vickery's job duties in his first position as Procedure Solutions Specialist involved working closely with surgeons to help them understand the DBS Nexframe equipment, which was similar to Navigation equipment.  When this position was eliminated, Vickery became an ADM.

According to a Medtronic job description dated September 2010, an ADM "[w]orks in partnership and support of the DBS sales organization to help create new accounts, introduce new therapies/indications, assist with training internal and external people on DBS, and cover difficult cases."  (Pl.'s Ex. A., Doc. 52-1.)  Vickery

---

[1] The company is "vertically integrated" so that each division has a separate sales and marketing channel, each with its own general manager.  (Frenkel Dep. 12-16, Doc. 48-3.)

[2] Medtronic's Activa neurostimulator delivers a controlled electrical pulse to precisely targeted areas of the brain.  The devise is typically implanted subcutaneously and connected to an extension and lead implanted in the brain.

had more specialized knowledge than regular sales representatives.  As part of his ADM duties, Vickery trained surgeons on the use of the DBS Nexframe equipment, which was similar to equipment used in Navigation procedures. He also trained sales representatives, but he had no authority to discipline them.  As ADM, Vickery reported to the Neuromodulation division's southeast regional sales manager.[3]  When Vickery became ADM, Ty Atteberry was regional sales manager.  According to Vickery's understanding, there was no nationwide uniformity regarding an ADM's responsibilities.  Atteberry used his discretion based on the needs of the district to direct Vickery's job duties.

**Ross Becomes Manager**

In 2011, Charles Ross, who is African American, replaced Atteberry as sales manager.  As manager, Ross was aware of Vickery's background, education and experience.  Ross reported to Ellen Frenkel, the Vice President of Sales for DBS.  In addition to Vickery (the ADM) approximately twelve sales representatives and an undetermined number of clinical specialists reported to Ross.  The racial makeup of the employees under Ross's supervision was overwhelmingly white.  At most, there were three nonwhite employees--Jesus Azan, a sales representative, is Hispanic; Kelly Roberts, a clinical specialist, has been described as a person "of Persian descent;" and Eric Jackson, a sales representative fired by Ross prior to Vickery's termination, is African American.

According to Vickery, Ross was not a good manager.  He "was inconsistent in communication with the team and destructive in the way he interacted with some of

---

[3] Sales representatives also reported to the regional sales manager.

the team members," and he "targeted" certain individuals. (Pl.'s Decl. ¶ 7, Doc. 52-15.) On January 12, 2012, Ross gave Vickery a memorandum, known as a "letter of expectations," regarding improvements he wanted to see in Vickery's job performance. (*Id.* ¶ 9.) Vickery was surprised because this was the first time Ross informed him that he was not meeting expectations. (*Id.* ¶ 9.) From this point forward, the relationship between Vickery and Ross went downhill. As Vickery describes it,

> By 2012, it was clear Mr. Ross had targeted me. On a weekly basis, Mr. Ross failed to include me in team discussions and business meetings so that I could be informed of issues and respond to them. Mr. Ross regularly criticized me for being responsive to the requests of sales representatives. . . to assist them in covering cases and training, and yet he never took action that would give me the time or resources to respond to any unmet expectation he identified. He held me accountable for circumstances beyond my control repeatedly even though he knew what obstacles were interfering with my ability to respond to his demands within his desired time frame. This conduct from Mr. Ross was persistent, unremitting, and regular from January 2012 until I was fired.

(*Id.* ¶ 10.)

Vickery testified that "the way I felt and what I had seen with a couple of others is anybody that stood their ground or –or tried to defend their position, then –and they were white, they were marked [by] Ross." (Pl.'s Dep. 218, Doc. 52-14.) Two of Vickery's coworkers also perceived Ross to behave in a discriminatory manner. Barbara Williams, a former Medtronic sales representative, testified that Ross was hostile to comments by white employees but was not hostile to similar comments by nonwhites. (Williams Decl. ¶ 14, Doc. 52-17.) She also noted that Kelly Robertson (the clinical specialist "of Persian descent") received preferential treatment from Ross. Another former sales representative, Richard Plummer, also

complained to Human Resources that Ross had discriminated against him and that he "was being targeted because of [his] race and for [ ] being a witness for [his] Caucasian co-workers who were complaining about Mr. Ross."  (Plummer Decl. ¶ 10, Doc. 52-18.)

**The Hotel Incident and the White Elephant Comment**

In April 2012, Ross and Vickery attended a convention in Florida and were staying at the same hotel.  They made arrangements to ride together to the convention one morning, but Ross forgot and left Vickery at the hotel.  Later, during the same convention when a coworker asked why he was almost late for the meeting, Vickery explained that Ross had left him.  Vickery then commented: "Next time we're ever in Mississippi, I'll leave him in the lobby of the hotel and he can find his way to the hospital."  Another Medtronic employee, Dr. Sylvia Bartley, overheard this comment and thought it had racial overtones.  Bartley told Ross, who also thought the comment was racist.  Ross told Laura Neuenschwander of Human Resources, and an investigation ensued.

Vickery told Heidi Meyer, who was investigating the matter for Medtronic: "You know, it's almost like I'm being set up here. It's almost like it's a hostile work environment. It's almost like he's trying to push me out. And it's almost like reverse race discrimination going on. It's almost like he's got it against me that, you know, the team likes me. I work well with the team. I -- you know, I don't know what the issue is." (Pl.'s Dep. 209) In a follow-up conversation, Vickery thinks he "reiterated it seems like retaliation at this point, that -- that it was hostile. I felt like it was violating me in a sense that he was coming after me and targeting me." (*Id.* 213)

Vickery feared retaliation from Ross because "any time you stood up or disagreed with Mr. Ross, you were -- you could -- you didn't even have to hold your breath; you were getting some kind of negative feedback on something that was not even related to that situation." (*Id.*)

At a sales meeting that occurred after this investigation, another employee brought up "backstabbing and lying in the Southeast district." (*Id.* 183-84) In response, Ross looked directly at Vickery and said, "Well, let's discuss the white elephant in the room." (*Id.* 184) After he made the remark, Ross "went on to discuss how [the group] should work together, . . . teamwork, how he. . . would do a better job in communicating." (*Id.*) Vickery considered Ross's "white elephant" comment to be "a racist remark." (*Id.)*

**Use of Navigation Equipment During Surgery at Sacred Heart Hospital**

On July 25, 2012, Vickery was at Sacred Heart Hospital in Pensacola along with Michael Tapley, a Medtronic sales representative, and Brian Beck, a new Medtronic employee, for training. Brian Nguyen, a sales representative from the Navigation unit, asked Vickery to cover for him in a spine surgery because he had been called to an emergency at another hospital. Nguyen had already set up the equipment so that all Vickery had to do was to aim the camera for the surgeon. Vickery worked under the direction of the surgeon, and the Navigation camera "operated in the same way as when [Vickery] was a Navigation clinical specialist and in the same way as when using Nexframe [i.e., DBS] technology." (Pl.'s Decl. ¶

15.)  Vickery did not believe he was doing anything wrong when he filled in for Nguyen, and his assistance prevented any delay in the procedure.[4]  (*Id.* ¶ 11.)

Ross learned about this incident on August 23, 2012 in a meeting with Vickery and Tapley.  Ross summarized that meeting in a memo to Laura Neuenschwander.  (Def.'s Ex. 2, Doc. 49-1.)  Tapley told Ross that he "was going over planning software with Brian [a new hire] when he noticed Carl was not present. "  (*Id.*)  Tapley learned that Vickery was "'[r]unning the Stealth [Navigation equipment] in a spine case for the surgeon.'"  (*Id.*)  In the meeting, Vickery confirmed to Ross that "'he ran the camera for a spine case for the surgeon'" but was "'just helping the local MNav rep out.'"  (*Id.*)  Ross informed Vickery that this was a violation of policy.  (*Id.*)

**Transfer Request**

On August 29, 2012,  Vickery told Laura Neuenschwander that Ross "had been hostile towards me and his communication, or lack of communication, that he did not follow up with questions, . . . or he was supposed to have a conference call with me on the plan; he never followed up with that.  And I felt like I was being set up and that I felt that race was involved; I felt retaliation was involved (Pl.'s Dep. 244.)  Vickery requested that he be transferred.  (*Id.*)  Medtronic, however, was already moving toward termination and, therefore, did not grant the transfer request. (Neuenschwander Dep. 41, Doc. 48-8.)

---

[4] The surgery would have gone ahead, even if Vickery had not assisted. However, the nurse practitioner would have run the camera and would have been required to resterilize each time she touched the camera.  As a result, the surgery would have taken longer, thereby increasing both the length of the surgery and the patient's time under anesthesia.  (Vickery Decl. ¶ 11.)

**Termination**

On September 11, 2012, Medtronic terminated Vickery's employment. (Ross. Dep. 74-75, Doc. 48-4.) Ross and Ellen Frenkel, Medtronic's Vice President of Sales for DBS, jointly made the termination decision based on: (1) Vickery's poor judgment in assisting with the procedure for which he was not trained (the Sacred Heart spine surgery) and (2) his repeated failure to meet performance expectations outlined by Ross. (*Id*.) Regarding performance expectations, Ross testified that Vickery failed to work toward account development, failed to "deliver training … to groups of neurologists," and generally failed to strike a proper balance between providing clinical support and developing new accounts. (*Id.* 75-78.) Medtronic's written policy required that "prior to providing any technical support a representative must be trained on the products they support." (Def.'s Ex. 6, Doc. 49-2.) Although Vickery had been trained on the equipment used in the spine surgery when he was in the Navigation division, his did not possess current training or credentials to operate Navigation equipment when he took part in the spine surgery at Sacred Heart. (Neuenschwander Dep. 41-43.)

**Post-Termination Application for Navigation Position**

Within days of his termination, Vickery applied for a clinical specialist position in Medtronic's Navigation division. (Pl. Dep. 228.) Erik Bruskotter, a Navigation regional sales director, interviewed two candidates for the job—Vickery and Lori Josey, an African American. Before the interview, Vickery spoke to Bruskotter, whom he had known when he worked in Navigation, via telephone. Vickery told Bruskotter that he was interested in the position and also explained

that he had been terminated from Medtronic.  (*Id.*) Vickery asked if that was going to be a problem, and Bruskotter assured him that "[a]s long as you are rehireable, I definitely don't have a problem with you, definitely want you to interview and you would definitely be one of the top candidates." (*Id.* 230.)   At the interview, Bruskotter asked Vickery why he was let go, and Vickery explained that he had some challenges with the sales reps, that there were some conflicts, and that he also had some challenges with his manager.  (Bruskotter Dep. 73, Doc. 48-5.)  Bruskotter told Vickery that he had one more person to interview and that "if everything works out," he would be giving Vickery a call.  (Pl. Dep. 231.)

Vickery was actually Bruskotter's second interview.  (Bruskotter Dep. 58.) Bruskotter had already interviewed Josey, whom he found to be a solid candidate. Josey's training and experience made her a good fit for the position. She had clinical experience working with hospital staffs that involved supporting other types of surgical equipment, experience with a radiology device that had some similarities to Navigation equipment, and a degree in computer information systems, which would obviously be of value working with computers and software. (*Id.* 60-63.)

Immediately after Vickery's interview, Bruskotter decided that Vickery would be a better fit for the position because he had a background with Navigation. (*Id.* 74.)  That same day, Bruskotter sent an email to Veronica Lambert, the HR person assigned to his group informing her that he wanted to put together an offer letter for Vickery.  In the email Bruskotter also explained that Vickery had been "let go" by Activa but that he was eligible for rehire.  (*Id.* 81-82.)  Lambert had some questions about why Vickery had been "let go," which led to a telephone

conversation the following day between Bruskotter and Lambert. (*Id.* 84.) Between the time of the email exchange and the time of his conversation with Lambert, Bruskotter began to rethink his decision. (*Id.* 85.) Bruskotter talked about the situation with Lambert and told her that he had begun to have "a lot of concerns . . . given the friction that [Vickery] had mentioned. . . with the sales rep and the manager." *Id.* By the end of the conversation, Bruskotter decided "to move forward with [Josey] instead of [Vickery]." (*Id.* 86.) Bruskotter subsequently had a telephone conversation with Vickery to inform him of the decision. (*Id.* 90.) According to Vickery, Bruskotter told him "HR had put a kibosh on me coming on board." (Vickery Dep. 231.)

Vickery subsequently filed the instant action against Medtronic, asserting numerous employment discrimination and retaliation claims under 42 U.S.C. § 1981. Specifically, Vickery claims that Medtronic terminated his employment because of his race, that Medtronic failed to rehire him because of his race and that Medtronic subjected him to a hostile work environment because of his race. Further, Vickery alleges that Medtronic retaliated against him for complaining of race-based discrimination by terminating his employment, by refusing to transfer him to a different position prior to his termination, and by refusing to rehire him following his termination.

**ISSUES PRESENTED**

On summary judgment, Medtronic argues that Vickery cannot produce sufficient evidence to support any of the six claims he has asserted. In his response brief, Vickery addresses only four of those claims, omitting his claims for

discriminatory failure to rehire and retaliatory termination.  In reply, Medtronic

asserts that those unaddressed claims have been abandoned.  In surreply, Vickery

argues that he did not intentionally abandon those claims.  Below, the Court sets out

the applicable legal standards and explains why certain claims are deemed

abandoned before addressing the sufficiency of the evidence as to each of the

remaining claims—discriminatory termination, hostile work environment,

retaliatory refusal to transfer, and retaliatory refusal to rehire.

**LEGAL ANALYSIS**

 **Applicable Standards of Review**

> ***Summary Judgment Standard***

Summary judgment should be granted only if "there is no issue as to any

material fact and the moving party is entitled to a judgment as a matter of law."

Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears "the initial burden

to show the district court, by reference to materials on file, that there are no genuine

issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,*

929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has satisfied his

responsibility, the burden shifts to the nonmoving party to show the existence of a

genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient

showing on an essential element of her case with respect to which she has the

burden of proof,' the moving party is entitled to summary judgment."  *United States

v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).

"In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted).  "However, we draw these inferences only "'to the extent supportable by the record.'" *Penley v. Eslinger*, 605 F.3d 843, 848  (11th Cir. 2010) (quoting *Scott v. Harris*, 550 U.S. 372, 381 n. 8 (2007) (emphasis omitted)).   Furthermore, "[a] dispute over a fact will only preclude summary judgment if the dispute "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, (1986))

### *Employment Discrimination & Retaliation Framework*

For more than 30 years, federal courts have relied on the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981), to analyze employment discrimination and retaliation claims based on circumstantial evidence. *See, e.g., Chapman v. A1 Transport,* 229 F.3d 1012, 1024  (11th Cir. 2000) (en banc)(analyzing ADEA claim using *McDonnell Douglas/Burdine* analysis); *Combs v Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (racial discrimination).[5] Under that framework, a plaintiff bears the initial burden of establishing a prima

---

[5] The same analysis applies to discrimination and retaliation claims brought under Title VII, § 1981 and the Age Discrimination in Employment Act (ADEA).  *See e.g., Brown v. Alabama Dept. of Transp.*, 59 F.3d 1160, 1174 n. 6 (11th Cir. 2010) (Title VII and § 1981); *Chapman*, 229 F.3d at 1024 (ADEA and Title VII); *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008) (retaliation under Title VII and § 1981).  Therefore, the case law in these types of cases is interchangeable.

facie case of discrimination or retaliation through circumstantial evidence. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1527 (11th Cir. 2000). If the plaintiff does so, a presumption of discrimination or retaliation is created and the burden shifts to the defendant to produce a legitimate nondiscriminatory reason for its action. *Id.* 1527-28. If the defendant meets his burden (which is a burden of production, not persuasion), then the presumption disappears, and the plaintiff must "'demonstrate that the proffered reason was not the true reason for the employment decision.'" *Id.* (quoting *Burdine*, 450 U.S. at 256). This may be accomplished "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.*

**Review of Plaintiff's Claims**

### *Abandoned Claims*

Vickery's summary judgment response fails to address his claims for discriminatory failure to rehire and retaliatory termination. The Eleventh Circuit has long held that "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *RTC v. Dunmar Corp*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Clark v. City of Atlanta*, ___ Fed. Appx. ___ 2013 WL 6037179 (11th Cir. Nov. 15, 2013) (district court properly treated as abandoned claims not addressed in opposition to summary judgment motion). Vickery asserts, in surreply, that he should not be penalized for the "lack of clarity" in his summary judgment response. Plaintiff's problem is more than a lack of clarity. He has failed to address the claims at all.

Plaintiff's counsel points to last-minute difficulties she encountered in filing the summary judgment response and to her "good faith belief" that the submission entitled "Plaintiff's Statement of Disputed Facts Requiring Trial" would be sufficient to preserve the claims not addressed in Plaintiff's summary judgment response brief.   But a statement of disputed facts—even one as extensive as this—does not explain how the facts relate to any specific legal claim, much less the *legal sufficiency* of the claims.   "[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."   *Dunmar*, 43 F.3d at 599.   Because Plaintiff provided no argument to support his claims for discriminatory failure to rehire and retaliatory termination, those claims are deemed abandoned.

### *Discriminatory Termination Claim*

Medtronic argues that it is entitled to summary judgment, first, because Vickery cannot prove a prima facie case of discrimination.  Most often an employee asserting discriminatory discharge demonstrates a prima facie case by proving that: (1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly-situated individual outside his protected class. *Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dept. of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1289 (11th Cir. 2003).  However, "[t]he methods of presenting a prima facie case are not fixed; they are flexible and depend to a large degree upon the employment situation."  *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1987 (11th Cir. 2004).  A plaintiff's discrimination claim is not doomed simply because there are no similarly-situated

employees who may be used as comparators. *Smith v. Lockheed-Martin Corp*, 644 F.3d 1321 (11th Cir. 2011). Recognizing that Vickery relies on "other evidence" to prove discrimination, Medtronic argues that Vickery's evidence is not sufficient to raise an inference of intentional discrimination.

Vickery's response is two-fold. First, citing *Smith,* Vickery argues that the entire *McDonnell Douglas* framework can be cast aside and that he need only prove "any circumstantial evidence from which a reasonable inference of discrimination can be drawn." (Pl.'s Br., Doc. 53 at 16.) Alternatively, Vickery asserts that he can prove a prima facie case under *McDonnell Douglas.* Taking the latter argument first, it is easy to understand why Vickery relies so heavily on the former. Vickery points to Kelly Robertson as a comparator and argues that she was "a person of color . . . known by Ross to have performed work outside of her training and experience without being terminated." (Pl.'s Br. 18, Doc. 53.) To satisfy his burden, Vickery must prove that he and Robertson were similarly situated in all relevant respects and that Robertson's misconduct was "nearly identical" to his own. *Wilson*, 376 F.3d at 1091. The supporting evidence he cites, however, falls *far* short of proof.

Vickery cites to his own declaration and that of Williams, a former sales representative who worked with Robertson. In his own declaration, Vickery avers that "Mr. Ross knew Kelly Robertson had performed work without certification without disciplining her." (Pl.'s Decl.¶ 12, Doc. 52-15.) Because Vickery does not identify the work Robertson did without certification, it is impossible to say that it was similar in all relevant respects to the conduct for which Vickery was terminated. Williams' declaration does not identify any work Robertson performed without

certification.  Instead, Williams complains that Robertson did not perform her job and Ross did nothing about it.  (Williams Decl., ¶ 14, Doc. 52-15.)

Whether the Eleventh Circuit in *Smith* created an alternative to the *McDonnell Douglas* paradigm in its entirety or merely an alternative method of proving the fourth element of a prima facie case is the subject of debate.  *See, e.g., Bell v. Crowne Mgmt, LLC*, 844 F.Supp.2d 1222, 1232 (S.D. Ala. 2012) (to extent *Smith* suggests burden-shifting paradigm of *McDonnell Douglas* can be ignored in circumstantial evidence case, "it is in tension with a long line of Eleventh Circuit precedent" and "with *McDonnell Douglas* itself"); *Williams v. Cleaver Brooks, Inc.* , 2012 WL 6151141, *7 n. 9 (M.D. Ga. Dec. 11, 2102) (noting with interest the relevant portion of *Bell*).  This Court need not wade into the debate, however, because Vickery's "other evidence" does not amount to the type of "convincing mosaic of circumstantial evidence" that would allow a jury to infer intentional discrimination.

As circumstantial evidence of discriminatory intent Vickery argues, first, that "[p]roof of bias by a decision-maker against other employees is probative of discriminatory animus even if those employees are not similarly situated." (Pl.'s Brf. 15, Doc. 53.) Vickery's potential "bias" evidence is of two types.[6]  First is evidence that other employees were mistreated and abused by Ross. Undoubtedly, there were issues with Ross's management style.  He may have treated some employees unfairly, but there is no evidence from which a factfinder could reasonably infer that

---

[6] The difficulty with this claim is that Vickery does not explain what he believes to be evidence of Ross's racial bias, leaving the Court to comb through his proposed facts to arrive at some possibilities and then to sift through pages of depositions and declarations to determine whether the evidence supports those "facts".

he did so because of their race.[7]  Vickery's second type of "bias" evidence is that

Ross showed favoritism to nonwhite employees.  A former coworker, Barbara

Williams observed that Ross responded more positively to Eric Jackson, an African

American, than he did to white employees; that he spoke more kindly to Jesus Azan,

a Hispanic, than he did to white employees; and that he gave preferential treatment

to Kelly Robertson, a clinical specialist who is "of Persian descent." (*Id.* ¶¶ 13-14.)

As additional circumstantial evidence of discrimination, Vickery points again

to Kelly Robertson, arguing that she engaged in conduct outside the scope of her

employment and was not disciplined.   But that vague claim, supported by no

specific information as to conduct, provides no basis for any inferences. [8] [9]

Vickery's final piece of circumstantial evidence of discriminatory termination

is his claim that "he did not violate any policy or engage in any misconduct."  (Pl.'s

Brf. 17.)  The evidence does not support Vickery's claim.  At the time Vickery

covered the spine surgery at Sacred Heart Hospital, Medtronic had a policy that

---

[7] Vickery misses the mark with his argument that this is "me too" evidence that can be considered as probative of discriminatory intent.  It is only probative if the evidence proffered demonstrates discriminatory intent. Since one could not reasonably conclude that Ross discriminated against the other employees because of their race, no inference can be made that he intentionally discriminated against Vickery on account of race.

[8] *See* discussion, *supra* at 15, regarding Robertson's alleged misconduct. If Vickery is implying that Robertson's failure to perform her job duties is equivalent to engaging in out of scope conduct, that is simply wrong.

[9] In the "Statement of Material Facts" section of his summary judgment response, Plaintiff implies that he has "been disadvantaged in responding" to this issue because no ruling has been entered on a pending discovery motion "that would likely produce evidence favorable to Plaintiff if allowed."  (Pl.'s Rsp. 11 n.3.) Pursuant to Fed. R. Civ. P. 56(d) if a party "cannot present facts essential to justify its opposition," it must present  "an affidavit or declaration" setting forth the "specified reasons" it cannot do so.  A vague footnote in a summary judgment response is not sufficient.

required its employees to be trained on the products they support. Vickery did not possess current training or credentials for the Navigation equipment. Vickery asserts that the training he had was sufficient, but that is nothing more than a disagreement with Medtronic's policy. It is not evidence that the policy did not exist, nor is it evidence that he did not engage in misconduct.[10]

In summary, Vickery has presented evidence that Ross was vindictive toward employees who stood up to him and that Ross was more positive to a nonwhite employee (whom he later fired), spoke kindly to another nonwhite employee, and did not force a third nonwhite employee to perform her job duties. This type of evidence—that a manager treated employees unfairly and showed slight favoritism toward others—cannot be the "convincing mosaic" that the *Smith* court had in mind.[11] Indeed, this is exactly the type of case that requires a court to sift through

---

[10] Vickery's argument that he did not violate any policy is followed by a series of "facts" intended to prove that claim. The actual evidence cited does not support the "facts" asserted. But even if it did those "facts" would demonstrate only that the policy was not clearly conveyed to Medtronic's employees. Specifically, he claims that sales representatives frequently did things that were "out of scope," and that they received confusing information about what was "out of scope." Failure to communicate a policy does not mean that no policy existed. And "out of scope" is not the same as providing support using equipment for which one has not been trained. Vickery also claims that he was led to believe that working on Navigation equipment was not against Medtronic policy. In his declaration, he recounts an April 2012 meeting of ADM's: "I heard Van Allen [another ADM] talk about covering Navigation cases (which includes spine and cranial cases). This discussion did not involve any criticism by Dr. Bartley [a Medtronic supervisor] or identification of any policy in Medtronic being violated." (Pl.'s Decl. ¶ 11.) Again, failure to clearly communicate a policy does not mean it does not exist. Finally, Vickery asserts that no policy was identified to explain his termination. Once again, the failure to specifically identify the policy does not negate its existence.

[11] The plaintiff in *Smith* was terminated under the Lockheed Martin's "zero tolerance" policy because he forwarded a racist email from his work email. At the time, the company had "a substantial incentive to discipline white employees more harshly than black employees" because its historic treatment of African American

personnel disputes and reexamine a defendant's business decision based on the slight possibility that somewhere there might be a whiff of discriminatory intent. *Cf. Denney v. City of Albany,* 247 F.3d 1172, 1188 (11th Cir. 2001) (federal courts are not intended to sit as "a super-personnel department").

### *Hostile Work Environment Claim*

The Supreme Court has defined a hostile work environment as "[a] workplace [ ] permeated with 'discriminatory intimidation, ridicule, and insult,' that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). An employment discrimination claim based on hostile work environment has both an objective and a subjective component. It requires proof of an environment that "a reasonable person would find [it] hostile or abusive" and that the "victim . . . subjectively perceive[d] . . .to be abusive. *Id.* 510 U.S. at 21. "It is a 'bedrock principle that not all objectionable conduct or language amounts to discrimination under Title VII.' Therefore, only conduct that is 'based on' a protected category, such as race, may be considered in a hostile work environment analysis. *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1297 (11th Cir.

---

employees was facing national scrutiny. *Smith*, 644 F.3d at 1341. Allegations of company-wide racial intolerance were about to be the subject of an ABC television news investigative report. The news coverage stemmed from the racially-motivated shooting of several African American employees by a former employee who was also a white supremacist.

2012) (quoting *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 809 (11th Cir. 2010) (en banc)).  Vickery's evidence falls short.[12]

　Vickery's hostile work environment argument relies heavily on evidence that Ross mistreated him, held him to unrealistic standards and, generally, made his work life miserable.  Even if this could be considered evidence of harassment, anti-discrimination laws "do[ ] not prohibit harassment alone, however severe and pervasive."  *Baldwin v Blue Cross/Blue Shield of Ala.*, 480 F.3d 1287, 1302 (2007).  And Vickery's evidence does not demonstrate that this mistreatment was based on race.

　Vickery's primary argument is that white subordinates who stood up to or challenged Ross became targets of Ross's abuse.  This evidence has no probative value in proving a *racially* hostile work environment because the workforce under Ross's command was overwhelmingly white. Thus, the modifier "white" to describe "employee" is almost redundant.  Coupled with the lack of evidence that any nonwhite employee ever challenged Ross, Vickery's evidence proves only that those who stood up to Ross were targeted.[13]

　Although Vickery does not specifically cite it as part of his hostile work environment argument, Ross's "white elephant in the room" comment might be

---

[12] Because the Court finds insufficient evidence to prove a racially hostile work environment, it need not address Medtronic's *Faragher/Ellerth* affirmative defense.

[13] Vickery asserts that "[t]he work environment created by Ross was characterized by bias in favor of persons of color, regardless of what they said or how they were performing."  This sweeping allegation mischaracterizes and/or vastly overstates the supporting evidence cited, which is the some of the same evidence the Court has found insufficient to support Vickery's discriminatory discharge claim.  *Supra* at 16.

considered evidence racial bias.  However, as the Supreme Court has pointed out, "'mere utterance of an … epithet which engenders offensive feelings in an employee does not sufficiently affect the conditions of employment" to support a hostile work environment claim.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Svgs. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986)).  On the spectrum of objectionable conduct—from severe to merely offensive—the "white elephant" comment falls squarely at the low end.  The comment--even when considered in the totality of the circumstance (i.e., Ross was a difficult boss who did not treat Vickery well and targeted employees who stood up to him)[14] the comment does not create an actionable hostile work environment .[15]

### Retaliation Claims

Vickery has asserted retaliation claims based on: (1) Medtronic's refusal to transfer him prior to his termination and (2) Medtronic's refusal to rehire him to a different position shortly after his termination.  The parties agree that these retaliation claims should be evaluated under the *McDonnell Douglas* burden-shifting framework.  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).   First, the plaintiff must establish a prima facie case of retaliation.  *Id.*  If the plaintiff meets this burden, the defendant must articulate a legitimate non-

---

[14] The term "elephant in the room" refers to an obvious problem that is not acknowledged, while the term "white elephant" refers to a costly object that provides little reward or profit *See*  www.merriam-webster.com.

[15] Both parties' proposed findings of fact have devoted considerable attention to events surrounding Vickery's remark about leaving Ross in Mississippi. Neither party has explained the relevance of these events to any particular claim. It does not support the hostile work environment claim, if that is its purpose.  Ross believed Vickery's remark, as it was repeated to him, to be racist and reported it to Human Resources.  Reporting a remark with racial overtones is not race-based harassment.

retaliatory reason for its action.  If the defendant does so, then the plaintiff must prove that the proffered reason is pretextual.  The success or failure of Vickery's retaliation claims depends on his ability to prove a prima facie case, since that is the only challenge Medtronic has raised on summary judgment.  "To establish a prima facie case of retaliation under Title VII, 'the plaintiff must show (1) that [he] engaged in statutorily protected expression; (2) that [he] suffered an adverse employment action; and (3) that there is some causal relation between the two events.'"  *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007) (per curiam).

Medtronic argues that Vickery cannot establish a causal connection between his complaints about discrimination and either of the adverse employment action. Vickery complained three times that he believed his was the victim of racial discrimination:  (1) to Laura Neuenschwander in January or February 2012; (2) to Heidi Meyer in April or May of 2012; and (3) to Laura Neuenschwander in late August 2012, a couple of weeks before his termination. To prove a causal connection between these complaints and Medtronic's employment decisions, Vickery must show " that the decision-maker[s] [were] aware of the protected conduct, and that the protected activity and the adverse action were not wholly unrelated." *McCann v. Tillman,* 526 F.3d 1370, 1376 (11th Cir. 2008) (internal quotation and citation omitted).  Close temporal proximity between the protected activity and the adverse employment action can serve as evidence that the two events are "not wholly unrelated." *Id.*  "But mere temporal proximity, without more, must be 'very close.'" *Thomas v. Cooper/Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)).  "Very close" means, at the

very least, less than three months between the statutorily protected expression and the adverse employment action. *Id.* Consequently, Vickery cannot establish a prima facie case based on the first two complaints because each was than three months prior to the first adverse action (failure to transfer). As to the remaining complaint, temporal proximity may exist, but it is not enough to establish causation under these circumstances.

Medtronic contends that no causal connection exists between Vickery's August 2012 complaint and the retaliatory failure to transfer claim because the transfer request was made after it had begun moving toward Vickery's termination. Vickery offers no coherent response to this argument.[16] While Vickery might argue that the August 2012 complaint and the refusal to transfer are not wholly unrelated because they occurred in same conversation, any inference of causation based on temporally proximity of these events is negated by the fact that Medtronic was in the process of terminating Vickery's employment when they occurred. *Cf. Castillo v. Roche Laboratories, Inc.*, 467 Fed. Appx. 859 (11th Cir. 2012) (finding that complaint of discrimination post-dated defendant initially contemplated termination negated inference of causation based on temporal proximity).

With respect to the retaliatory refusal to hire claim, Medtronic argues that no causal connection exists because there is no evidence that Erik Bruskotter, the person who made the hiring decision, was aware of Vickery's protected conduct. Vickery does not dispute Bruskotter's lack of knowledge, but he does dispute that

---

[16] In a three-sentence argument directed to this claim, Vickery states that he had a conversation with Neuenschwander on August 29, 2012 in which he complained of racial discrimination and retaliation and that he was terminated on September 11, 2012.

Bruskotter was the decisionmaker.  Vickery points to his own testimony that Bruskotter told him the Human Resources "put the kibosh" on his hiring.  Thus, according to Vickery, "Human Resources" made the decision.  But in the absence of evidence that the person or persons in Human Resources who vetoed Vickery's hiring also knew about his protected conduct, his claim fails.[17]

**Conclusion**

In sum, Vickery has failed to meet his burden on summary judgment as to any of the claims asserted in his complaint.  Accordingly, Medtronic's motion for summary judgment is **GRANTED**.

**DONE** and **ORDERED** this the 3rd day of February, 2014.


**s/**_Charles R. Butler, Jr._
**Senior United States District Judge**

---

[17] The only evidence before the Court as to any specific intervention by Human Resources is Bruskotter's testimony that Victoria Lambert, the Human Resources representative assigned to his division, sent him an email questioning why Vickery was let go.